James R. Marsh
Bar ID: 436448
Marsh Law Firm PLLC
P.O. Box 4668 #65135
New York, NY 10163-4668
Telephone / Fax: (212) 372-3030
Email: jamesmarsh@marshlaw.us



Clerk, U.S. District and
Bankruptcy Court

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| "JANE DOE" on behalf of herself and similarly situated others           Petitioner, <br> v. <br><br> UNITED STATES DEPARTMENT of HEALTH and HUMAN SERVICES and KATHLEEN SEBELIUS in her official capacity as Secretary of the United States United States Department of Health and Human Services        Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case: 1:14-cv-00366
Assigned To : Howell, Beryl A.
Assign. Date : 3/6/2014
Description: Admin. Agency Review

**PETITION FOR WRIT OF MANDAMUS AND FOR EQUITABLE RELIEF**

## I. INTRODUCTION

1. This petition seeks mandamus and equitable relief pursuant to the All Writs Act, 28 U.S.C.

   § 1361, and the Administrative Procedure Act, 5 U.S.C.S. § 706(1), compelling the

   Respondent United States Department of Health and Human Services (DHHS) and

   KATHLEEN SEBELIUS in her official capacity to provide a prompt investigation and

   resolution of her complaint now pending before the Respondent agency, and to render a

   decision before March 7, 2014 when a new federal law takes effect that will substantially

   undermine Petitioner's rights. Alternatively, this petition seeks an order from this Court

   requiring Respondents to apply the law in effect at the time Petitioner filed her complaint

   with the Respondent agency even if Respondents resolve Petitioner's complaint after March

RECEIVED
Mail Room

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

7, 2014. Petitioner also seeks equitable relief on behalf of herself and similarly situated class-members.

2. Petitioner filed a complaint with the Office for Civil Rights at the Department of Health and Human Services (DHHS) on June 29, 2012—more than eighteen months ago—(Complaint No. 03-12-145773), pursuant to Title IX of the Education Amendments of 1972 and Title IV of the Civil Rights Act of 1964. [Appendix, Document 1] That complaint alleges that the University of Virginia (UVA) failed to provide prompt and equitable redress in connection with its investigation and resolution of a matter arising out of severe sexual harassment and misconduct perpetrated against Petitioner in December 2011.

3. Petitioner filed a similar complaint days earlier arising out of the same underlying offense with the Office for Civil Rights at the Department of Education (DOE). That investigation also is still pending after more than eighteen months, and Petitioner has concomitant with this Petition filed a separate action in this Court seeking similar relief.

4. The Respondents have failed to comply with their obligation under 34 C.F.R. § 106 to provide a prompt investigation and resolution because no action has been taken on Petitioner's Complaint. The substantial delay in the investigation and resolution of Petitioner's complaint has frustrated the non-discrimination and agency review objectives of Title IX, causing harm to the Petitioner and similarly situated others.

5. Specific allegations against UVA in the underlying complaint include, but are not limited to, the following: UVA failed to promptly and equitably investigate and resolve Petitioner's complaint; UVA destroyed and/or withheld from consideration by its Sexual Misconduct Board (SMB) critical photographic evidence depicting Jane Doe's vaginal injuries; UVA failed to gather and provide to the SMB relevant evidence establishing that Jane Doe was

substantially incapacitated by rape drugs at the time of the incident in question, and; UVA unlawfully applied a burden of proof far stricter than the mandatory preponderance of the evidence standard.

6.  Respondents were obligated to complete their investigation and resolve Petitioner's complaint promptly. The underlying incident occurred more than two years ago, in December 2011. UVA determined the underlying sexual harassment/misconduct matter in favor of the offender and against the interests and rights of Petitioner in June 2012. Petitioner immediately filed a complaint with the Respondent agency in June 2012 and has repeatedly since then expressed her concern to the Respondents that her complaint was not investigated or resolved promptly.

7.  While Respondents are not subject to a specific mandatory timeframe within which such complaints must be resolved, Respondents adhere to a policy and practice of resolving Title IX complaints within 180 days and, according to Respondents' public statements, 95% of complaints are resolved within 180 days. See,

    http://articles.latimes.com/2007/jun/20/sports/sp-titleix20;

    http://www.washingtonpost.com/blogs/she-the-people/wp/2014/01/25/activists-applaud-white-house-effort-to-fight-campus-rapes/

8.  Nothing appears to justify the extensive delay in this matter (or in a similar class-based policy complaint still pending after three years against Harvard Law School). Indeed, a complaint against Yale involving more than a dozen different victims was filed in March 2011, long after the much simpler policy complaint was filed against Harvard Law School in the fall of 2010, but the Yale matter was resolved by OCR at the DOE more than eighteen months ago, in June 2012.

9.  As set forth at length below, a new federal law known popularly as the "Campus SaVE Act" (SaVE) will take effect on March 7, 2014. SaVE will substantially undermine Petitioner's rights and subject the redress of her claims now pending before the Respondent agency to less protective legal standards compared to the standards in effect at the time she filed her complaint. [Appendix, Document 4]

10. Petitioner specifically asked Respondents to resolve her complaint prior to March 7th because of the impending change in federal law. She also requested that SaVE's standards not be applied to her case irrespective of when her complaint is resolved. Petitioner asked the Respondents to confirm in writing whether a decision in her case would be issued before March 7th, but the Respondents declined to reply. Petitioner also asked Respondents to confirm in writing that SaVE's standards will not be applied to her complaint irrespective of when her complaint is resolved, but again, Respondents declined to reply. Petitioner then sent correspondence to Respondents stating that she would infer from Respondent's silence that SaVE's standards will in fact be applied to her complaint, and that if she did not hear otherwise by February 7, 2014, she would take all appropriate steps to obtain a legal remedy to protect her rights and to prevent Respondents from applying SaVE's standards to the redress of her complaint. Respondents again did not reply by February 7th or thereafter.

11. Although Respondents failed to respond to Petitioner's inquiries about SaVE, when asked the same questions about SaVE in reference to a similar Title IX investigation now pending with the DOE against Princeton University, the DOE's New York regional office replied that they could not confirm one way or the other whether SaVE's new standards will be applied if that complaint is resolved after March 7, 2014. The complaint against Princeton was filed and

opened for investigation by the DOE in the fall of 2010 and remains unresolved after more than three years.

12. A related investigation by the DOE is pending against Harvard Law School. That investigation, like the one against Princeton, was also opened in the fall of 2010 and, like the case against Princeton, remains unresolved after more than three years. The investigation of Harvard Law School was opened as a policy complaint, without an actual case or controversy, on behalf of the class of people intended to be protected by Title IX. The DOE agreed to determine whether certain of Harvard Law School's policies regarding the redress of violence against women were facially invalid. Those policies include: application of a standard of proof during redress proceedings more onerous than the federal law mandate of "preponderance of the evidence;" failure to provide "clear timeframes" and; failure to comply with title IX's promptness mandate by delaying grievance procedures, in some cases for more than a year, while external law enforcement matters are pending. Because the DOE's investigation of Harvard Law School is not related to an actual case or controversy, Petitioner includes allegations about that investigation here because that investigation was opened on behalf of the class of individuals represented by Petitioner, and Petitioner is seeking relief on behalf of herself and other class members.

## II. FACTS REGARDING THE RELATIONSHIP OF PETITIONER'S RIGHTS TO THE CLASS OF INDIVIDUALS AFFECTED

13. One in four to one in five women is victimized by rape or attempted rape during college.[1]

Given that approximately 916,000 women graduated from post-secondary schools in 2009,[2]

---

[1] https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf, pp. xii-xiii and 2-1 (2007); U.S. Department of Justice Office of Community Oriented Policing Services, Acquaintance Rape of College Students, March 28, 2002, http://www.cops.usdoj.gov/pdf/e03021472.pdf;
https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf.
[2] http://www.census.gov/prod/2012pubs/p20-566.pdf.

this means about 60,000 women are victimized by rape or attempted rape during college. By comparison, about 26,000 sexual assaults occur in the military each year,[3] a number which includes not only rape and attempted rape, but also relatively minor sexual touching not rising to the level of attempted rape.[4] Approximately 30% of sexual assault victims in the general population file reports.[5] A similar number of military victims file reports.[6] The number is much lower for college victims where only 5-12% of victims file reports.[7]

14. Female students in the United States have endured pervasive unequal treatment, harassment and violence on the basis of sex throughout all levels of education.[8] Women, including female postsecondary students, suffer disproportionately high rates of domestic and dating violence,[9] sexual assault,[10] and stalking.[11] In fact, a student is more likely to be victimized by sexual assault if she attends college than if she does not.[12]

---

[3] An estimated 26,000 sexual assaults occurred in all branches of the military in 2012, http://www.sapr.mil/public/docs/reports/FY12_DoD_SAPRO_Annual_Report_on_Sexual_Assault-VOLUME_ONE.pdf

[4] *Id.*

[5] http://www.rainn.org/get-information/statistics/reporting-rates

[6] http://www.usccr.gov/pubs/09242013_Statutory_Enforcement_Report_Sexual_Assault_in_the_Military.pdf, p.8.

[7] http://www.nij.gov/publications/pages/publication-detail.aspx?ncjnumber=182369 (2001) (5%); https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf, 5-22 (2007) (12.9%).

[8] Sadker, & Zittleman, *Still Failing at Fairness, How Gender Bias Cheats Girls and Boys in School and What We Can Do About It*, Scribner Press 2009; www.hks.harvard.edu/centers/carr/research-publications/carr-center-working-papers-series/caplan-and-ford-%22the-voices-of-diversity-%22.

[9] Women are less likely than men to be victims of violent crimes overall, but women are 5 to 8 times more likely than men to be victimized by an intimate partner. *Violence by Intimates: Analysis of Data on Crimes by Current or Former Spouses, Boyfriends, and Girlfriends*, U.S. Department of Justice, March, 1998; violence by an intimate partner accounts for about 21% of violent crime experienced by women and about 2% of the violence experienced by men. *Id.* 92% of all domestic violence incidents are committed by men against women. *Violence Against Women, Bureau of Justice Statistics*, U.S. Department of Justice, January, 1994; 84% of raped women know their assailants and 57% of rapes occur on a date. Koss, M.P. (1988). *Hidden Rape: Incidence, Prevalence and descriptive Characteristics of Sexual Aggression and Victimization in a National Sample of College Students*. In Burgess, A.W. (ed.) Sexual Assault. Vol. II. New York: Garland Pub.

[10] Nine out of ten rape victims are female, U.S. Department of Justice, *2003 National Crime Victimization Survey. 2003*; Women aged 16-24 are four times more likely to be raped than any other population group. Koss, M.P., *id.*

15. Petitioner is among the small number of college victims who did file a report with her university. She seeks relief on her own behalf and on behalf of all female postsecondary students, to ensure that her claims, now pending before the Respondent agency, are reviewed under legal standards in effect at the time she filed her claims, and standards that comport with the Constitution. Applicable standards will substantially be affected by certain provisions of SaVE which take effect on March 7, 2014.13

16. Certain provisions of SaVE have the purpose and effect of subjecting the redress of violence against women at post-secondary schools to inherently unfair legal standards and standards more burdensome and less protective than those applied to the redress of violence on the basis of other protected class categories such as race, color and national origin. In so doing, SaVE violates equal protection and due process, and rights protected under Title IX of the Education Amendments of 1972 and its implementing regulation, 34 C.F.R. Part 106, (Title IX) and Title IV of the Civil Rights Act of 1964 (Title IV).14

17. Long misunderstood to be primarily a sports equity rule for female athletes, Title IX expressly prohibits discrimination on the basis of sex in public schools and virtually all private schools. Discrimination on basis of sex includes gender-motivated harassment and

---

[11] 8% of women and 2% of men in the United States have been stalked at some time in their life. 78% of stalking victims identified in a survey were women, and 22 percent were men. Thus, four out of five stalking victims are women. By comparison, 94 percent of the stalkers identified by female victims and 60 percent of the stalkers identified by male victims were male. Overall, 87 percent of the stalkers identified by the victims were male. National Institute of Justice 1998. *Stalking in America: Findings from the National Violence Against Women Survey*).

[12] One in four students in the United States is victimized by rape or attempted rape during college, *see* n.1, while one in six American women is the victim of an attempted or completed rape in her lifetime. National Institute of Justice & Centers for Disease Control & Prevention. *Prevalence, Incidence and Consequences of Violence Against Women Survey*. 1998.

[13] 20 U.S.C. 1092 (2013), (modifying Section 485(f) of the Higher Education Act of 1965 (20 U.S.C. 1092(f)), and § 304 of the Violence Against Women Reauthorization Act of 2013 (hereafter "VAWA"), effective March 7, 2014. A copy of SaVE is attached hereto as Exhibit 2.

[14] Title IV prohibits discrimination in identified public entities, including schools and other "federally assisted programs," on the basis of *"race, color, sex, religion or national origin."* 42 U.S.C. §§ 2000c through 2000c-9; Equal Educational Opportunities Act of 1974, Title II, 20 U.S.C. §§ 1701-1758.

violence.[15] Modeled after Title VI of the Civil Rights Act of 1964 which provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 42 U.S.C. §§ 2000d–2000d-7, Title IX uses exactly the same enabling language in forbidding discrimination "on the basis of sex" in education. Title IX specifically provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681(a).

18. While SaVE does not explicitly state that it applies only to "violence on the basis of sex," it is, by its terms, expressly limited to such harm because it covers only "domestic violence, dating violence, sexual assault, and stalking," which offenses are committed most often against females.[16]

19. Certain provisions of SaVE are facially unconstitutional[17] and/or unconstitutional as applied. As such, they violate Petitioner's equal protection and due process rights. Although constitutional claims alleging gender discrimination in larger society are subjected to somewhat less strict scrutiny ("exacting scrutiny") compared to constitutional claims alleging violations based on other protected class categories such as race, color and national origin,

---

[15] *Education & Title IX,* NATIONAL WOMEN'S LAW CENTER (last visited Jan. 29, 2014), http://www.nwlc.org/our-issues/education-%2526-title-ix.

[16] *See* notes 11-13. *See also Research and Policy Analysis*, DIVISION OF THE MASSACHUSETTS EXECUTIVE OFFICE OF PUBLIC SAFETY AND SECURITY, http://www.mass.gov/eopss/agencies/ogr/research-and-policy-analysis.html.

[17] Query whether Congress even has authority to regulate violence against women. See *U.S. v. Morrison*, 529 U.S. 598 (2000); (Congress has no authority to regulate violence against women under civil rights laws or the Commerce Clause); *N'tl Federation of Independent Business v. Sebelius*, 567 U.S. ___ (2012) (Congress exceeds its authority under the Spending Clause if it imposes too heavy a burden on the states as a quid pro quo for receiving federal funds.)

("strict scrutiny"), there is no similar disparity in the standard of scrutiny when courts are examining the lawfulness of a school's administrative grievance procedures to ensure the equal treatment of females in the special environment of education.[18]

20. Whether subjected to "strict scrutiny" or "exacting scrutiny," certain provisions of SaVE violate and threaten Petitioner's rights under Title IX, Title IV, the First and Fourteenth Amendments to the United States Constitution.

### III. THE SAVE STATUTE

21. SaVE was introduced to Congress in April 2011 only days after the DOE publicly released a "Dear Colleague Letter" (DCL) announcing new interpretive guidance articulating established standards under which postsecondary schools are obligated by federal law to respond to and redress violence on the basis of sex.[19] The DCL was the DOE's interpretation of then existing relevant civil rights laws applicable to campus-based violence against

---

[18] *See Title IX Legal Manual*, THE UNITED STATES DEPARTMENT OF JUSTICE (last visited Jan. 30, 2014), http://www.justice.gov/crt/about/cor/coord/ixlegal.php (noting that "Congress consciously modeled Title IX on Title VI" and citing *Alexander v. Choate*, 469 U.S. 287, 294 (1985) (for the proposition that because Title IX and Title VI contain parallel language, the same analytic framework should apply in the context of administrative redress proceedings because both statutes were enacted to prevent unlawful discrimination and to provide remedies for the effects of past discrimination); *Justice Department Announces Investigations of the Handling of Sexual Assault Allegations by the University of Montana, the Missoula, Mont., Police Department and the Missoula County Attorney's Office*, DEPARTMENT OF JUSTICE (May 1, 2012), http://www.justice.gov/opa/pr/2012/May/12-crt-561.html (announcing Title IX compliance review and Title IV investigation of the University of Montana and noting, "Title IX of the Education Amendments of 1972 and Title IV of the Civil Rights Act of 1964 each prohibit sex discrimination, including sexual assault and sexual harassment in education programs"); *Resolution Agreement*, http://www.justice.gov/crt/about/edu/documents/montanaagree.pdf (announcing resolution agreement with the University of Montana and noting that Title IV and Title IX are subject to the same regulations to ensure enforcement of rights regarding discrimination, harassment, and violence in education "on the basis of sex." 28 C.F.R. Part 54 and 34 C.F.R. Part 106). *See also* the Civil Rights Restoration Act of 1987, which made clear that substantive standards from Title VI apply with equal force to Title IX, 20 U.S.C. § 1687; 29 U.S.C. § 794, 42 U.S.C. § 2000d-4a, and 42 U.S.C. § 6101; *1977 Report*, RAND OBJECTIVE ANALYSIS. EFFECTIVE SOLUTIONS, http://www.rand.org/content/dam/rand/pubs/reports/ 2008/R2136.pdf (1977 report examining disparities in programs and activities aimed at enforcing Title IX compared to programs and activities aimed at enforcing Title IV and noting that both statutes are equally designed to promote "sex desegregation" and "race desegregation").

[19] U.S. DEPT. OF EDUCATION OFFICE FOR CIVIL RIGHTS, DEAR COLLEAGUE LETTER (Apr. 4, 2011), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

women, particularly Title IX. SaVE by its terms modifies the "Clery Act," 20 USC 1092 (f);

34 CFR 668.46(b)(11)(vi), however Congress has broad authority to amend Title IX by

amending a related federal law, such as the Clery Act. Because SaVE covers all forms of

violence against women it clearly amends Title IX because Title IX covers the same violence.

SaVE thus threatens Petitioner's rights because the underlying incident suffered by Petitioner

was a severe sexual attack that fits the definition of "sexual assault" under SaVE as well as

the definition of "sexual harassment" under Title IX. To the extent provisions in SaVE

applicable to the redress of Petitioner's claims, and the claims of similarly situated others,

conflict with Title IX, the later enacted provisions of SaVE will prevail.

22. Before SaVE takes effect on March 7th, postsecondary schools are obligated to provide for

the "equitable" redress of student complaints alleging violence on the basis of sex.[20]

"Equitable" redress is also mandatory under Title IV[21] and Title VI.[22] An early iteration of

SaVE expressly required schools to provide "equitable" redress,[23] but that language was

---

[20] 34 C.F.R. § 106.8 (b); *Sexual Harassment Guidance,* http://www.ed.gov/about/offices/list/ocr/docs/shguide.html.

[21] *Among the University of Montana - Missoula, the U.S. Department of Justice, Civil Rights Division, Educational Opportunities Section and the U.S. Department of Education, Office for Civil Rights,* RESOLUTION AGREEMENT, *available at*
http://www.justice.gov/crt/about/edu/documents/montanaagree.pdf (announcing resolution agreement with the University of Montana and noting that Title IV and Title IX both require "equity" and are subject to the same regulations and standards of enforcement regarding discrimination, harassment and violence in education).

[22] *Title VI Enforcement Highlights Office for Civil Rights,* U.S. DEPARTMENT OF EDUCATION (last visited Jan. 30, 2014) http://www2.ed.gov/documents/press-releases/title-vi-enforcement.pdf (repeatedly noting that Title VI requires schools to apply standard of "equity"); *Title IX Legal Manual,* THE UNITED STATES DEPARTMENT OF JUSTICE (last visited Jan. 30, 2014);
http://www.justice.gov/crt/about/cor/coord/ixlegal.php (noting that "Congress consciously modeled Title IX on Title VI" and citing *Alexander v. Choate,* 469 U.S. 287, 294 (1985) (for the proposition that because Title IX and Title VI contain parallel language, thus the same analytic framework should apply because both statutes were enacted to prevent unlawful discrimination and to provide remedies for the effects of past discrimination).

[23] *See, e.g.,* H.R. 2016 – Campus SaVE Act, § 3,(6)-(8)(B)(v)(I)(aa),GOVTRACK.US, *available at* https://www.govtrack.us/congress/bills/112/hr2016/text (last visited Jan. 30, 2014).

removed before the bill was signed into law.[24] By removing the requirement of "equity,"

Congress allows and/or requires schools to provide inequitable redress[25] by applying less

protective legal standards compared to the redress of violence on the basis of other protected

class categories such as race, color and national origin.

23. Similar to the way in which the word "equitable" was initially included and then removed,

SaVE's original language mandated application of a "preponderance of the evidence"

standard in redress proceedings related to violence on the basis of sex,[26] but that mandate was

later removed.[27] Before SaVE takes effect, the "preponderance of the evidence" standard is

mandatory for the redress of violence on the basis of sex.[28] But under SaVE, schools may

apply a standard of proof more rigorous than "preponderance of the evidence."

Congressional intent on this point is confirmed by testimony noting that the "preponderance

---

[24] *See id* at 8(B)(iv)(1)(aa) ("[D]isciplinary" procedures "shall provide a prompt, fair and impartial investigation and resolution.")

[25] *See supra* U.S. DEPARTMENT OF EDUCATION, note 21. (repeatedly noting that Title VI requires schools to apply standard of "equity" in redress proceedings). *See also* 42 U.S.C. § 2000d-7 (requiring equal treatment on behalf of all protected class categories). In a section labeled "Civil rights remedies equalization," the statute provides that "(1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of § 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], Title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." This "Civil rights remedies equalization" mandate further states that "(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation *to the same extent* as such remedies are available for such a violation in the suit against any public or private entity other than a State." (emphasis added).

[26] H.R. 2016 – Campus SaVE Act, § 3,(6)-(8)(B)(v)(I)(aa),GOVTRACK.US, *available at* https://www.govtrack.us/congress/bills/112/hr2016/text (last visited Jan. 30, 2014).

[27] After eliminating the specific language requiring proof by a "preponderance of the evidence," the statute was rewritten to require only that "each institution shall develop and distribute a policy regarding the procedures to be followed in the redress of violence on the basis of sex," and that such a policy shall include "a statement of the standard of evidence that will be used during any institutional conduct proceeding" related to the redress of violence on the basis of sex. § 8(A)(ii).

[28] U.S. DEPT. OF EDUCATION, OCR, Dear Colleague Letter, dated April 4, 2011, 34 CFR § 106.71.

of the evidence" language was expressly removed from SaVE so as to allow schools to apply

a more burdensome standard of proof in the redress of violence on the basis of sex.[29]

24. Because "equitable" redress and application of the "preponderance of the evidence" standard

will remain mandatory in the redress of violence on the basis of other protected class

categories such as race, color and national origin, SaVE is facially unconstitutional because it

authorizes the discriminatory treatment of violence on the basis of sex. In practice, this

means that if a male student is physically beaten on the basis of his national origin, officials

would be obligated to resolve the matter in an "equitable" manner including application of a

"preponderance of the evidence" standard. However, if exactly the same violence is

perpetrated against a female student on the basis of her sex, (for example, a victim is badly

beaten by an abusive boyfriend), the matter need not be resolved "equitably," and school

officials would be permitted to assess the evidence under the rigorous criminal law standard

of proof "beyond a reasonable doubt." Application of any standard more strict than mere

preponderance would subject violence on the basis of sex to additional burdens and make

such civil rights harms more difficult to prove compared to violence on the basis of other

protected class categories such as race, color and national origin. Even more strangely, it

would subject the redress of certain claims to absurd dual assessments. For example, if a

black woman is sexually assaulted on the basis of her race and her sex at a school that opts to

apply a "beyond a reasonable doubt" standard under SaVE, the redress of that incident would

---

[29] One Congressman was strikingly candid about the reason the word "equitable" was stricken: "The majority bill said that college campuses must provide for 'prompt and equitable investigation and resolution' of charges of violence or stalking. This would have codified a proposed rule of the Department of Education that would have required imposition of a civil standard or preponderance of the evidence for what is essentially a criminal charge, one that, if proved, rightly should harm reputation. But if established on a barely "more probable than not" standard, reputations can be ruined unfairly and very quickly. The substitute eliminates this provision." (Testimony of Senator Grassley, Iowa, 158 Cong Rec. S 2761, Congressional Record, Sen., 112th Congress, 2nd Session Senate, April 26, 2012; Violence Against Women Reauthorization Act of 2011, Reference: Vol. 158, No. 61).

be subjected to a "preponderance of the evidence standard" only as to those aspects of the attack that occurred on the basis of her race. Aspects of that very same attack that occurred "on the basis of sex" would be assessed under a "beyond a reasonable doubt" standard.

25. SaVE further subjects violence on the basis of sex to inequitable redress by authorizing schools to provide a non-prompt "final determination." Specifically, SaVE provides that schools must conduct a "prompt investigation and resolution"[30] of a matter involving violence on the basis of sex, but schools need not be prompt when rendering a "final determination." The obligation regarding "final determinations" is addressed separately in SaVE, apart from provisions related to "investigations and resolutions," and expressly provides that schools must develop policies that describe "possible sanctions" that "may" be imposed "following the final determination" of a grievance proceeding involving violence on the basis of sex, including "rape and acquaintance rape."[31] In practice, this means the "final determination" of a student's complaint alleging violence on the basis of her sex can remain open for years. Indeed, because SaVE imposes no time limit whatsoever on "final determinations," a complaint need not be "finally determined" until the day of graduation, if at all. This lack of promptness in "final determinations" is inherently unfair and inhibits victimized students' access to oversight agencies such as the Respondent Department of Education. Without "promptness" in the investigation, resolution and final determination, a student cannot be protected from discrimination during her education. Thus, SAVE unconstitutionally subjects violence on the basis of sex to inherently unfair standards, and

---

[30] Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 89 (2013).
[31] Section B(II)(ii) (Each institution shall develop and disseminate a policy to address "...possible sanctions...that such institution may impose following the final determination regarding rape, acquaintance rape, domestic violence, dating violence, sexual assault and stalking.")

13

standards less protective than those applicable to the redress of violence on the basis of other protected class categories such as race, color and national origin.

26. SaVE requires schools to delay notifying victims of violence on the basis of sex that there has been a change to the initial decision regarding the responsibility and/or punishment of an accused student,[32] which could be as late as the day of graduation. This means the victim is unable to defend and protect her personal and civil rights in proceedings that follow the initial decision. For example, if a student offender is found responsible after the first disciplinary hearing, but then he files an appeal or a request for rehearing, the victim will only be notified of the results of that appeal or rehearing after the change is made to the original finding. This is inherently unfair as it means that if the results become final on the day of graduation, the victim could be informed of the fact her assailant was ultimately not held responsible, and the fact that the decision is final and unreviewable, as she is literally walking across the stage to receive her diploma. This subjects violence on the basis of sex to inherently unfair standards, and less protective standards compared to the redress of violence on the basis of other protected class categories such as race, color and national origin.

27. Lack of advance notice that a change could be made to a finding of responsibility or a determination of punishment interferes with a victim's rights, including her right to be heard. For example, the scope and impact of a victim's rights under Title IX is commonly in dispute during redress proceedings, and during appeals and re-hearings. Under SaVE, a victim need not be informed that her rights are being construed or even violated in appeals and re-

---

[32] SaVE states that such notice of the *fact* that a change has occurred is to be provided to the victim only at some unspecified time "*prior* to the time the results become final," (§ III (cc)) and that notice that the change is in fact "final" need not be provided until *after* the change "becomes final." (§ III (dd)) (emphasis added).

hearings, even if the initial decision is subsequently overturned or amended because of a wrongful application of her personal or civil rights.

28. SaVE provides that the Secretary of Education "shall seek the advice and counsel of the Attorney General of the United States and the Secretary of Health and Human Services..." when "preventing and responding to" violence on the basis of sex.[33] By mandating that such "advice and counsel" be sought when "responding" to institutions of higher education about matters involving violence on the basis of sex, SaVE imposes unfair and needless burdens on students seeking to enforce their rights through the assistance of the DOE as the primary responsible federal oversight agency. This unconstitutionally subjects violence on the basis of sex to additional burdens, including needless delays, thus subjects such violence to less protective standards compared to violence on the basis of other protected class categories because such "advice and counsel" from the DOJ and DHHS is not required when the DOE is "responding" to institutions of higher education about matters involving violence on the basis of other protected class categories such as race, color and national origin.

29. SaVE authorizes schools not to comply with annual statistical reporting or respond at all to violence on the basis of sex unless such violence is actually reported to school officials or law enforcement officials.[34] While actual notice has long been required to establish a school's liability in civil proceedings, actual or constructive notice was sufficient for institutional and regulatory enforcement of civil rights laws prior to the enactment of SaVE. Constructive notice includes, for example, anonymous or third-party reports such as a newspaper story of a

---

[33] Section 16(B) ("The Secretary shall seek the advice and counsel of the Attorney General of the United States and the Secretary of Health and Human Services concerning the development, and dissemination to institutions of higher education, of best practices information about preventing and responding to incidents of [violence on the basis of sex]").

[34] Section 8(A)(ii) (Each institution shall develop and distribute a policy regarding the "procedures each institution will follow once an incident of [violence on the basis of sex has] been reported...")

fraternity party describing incidents of sexual assault.[35] By limiting schools' responsibility to matters that were actually reported, SaVE authorizes schools to subject the redress of violence on the basis of sex to less protective legal standards compared to violence on the basis of other protected class categories such as race, color and national origin, to which schools must respond and which must be measured for statistical purposes under actual and constructive notice standards. In practice this means school officials can ignore with impunity violence on the basis of sex when not reported, even if the violence is sufficiently obvious that officials "should know" or actually do know about it. However, if violence occurs on the basis of any other protected class category, such as race, color or national origin, officials must respond and measure for statistical purposes even if the incident is not reported so long as they knew or should have known that the incident occurred.[36] This will disproportionately undermine schools' response to and reporting of violence on the basis of sex because, as noted above, such violence is rarely officially reported.

30. SaVE authorizes schools not to provide statistical reporting on matters involving violence on the basis of sex unless such violence causes bodily injury.[37] While bodily injury is also required as a prerequisite to statistical reporting on matters involving violence on the basis of

---

[35] *Dear Colleague Letter*, DEPARTMENT OF EDUCATION OFFICE FOR CIVIL RIGHTS, http://www.whitehouse.gov/sites/default/files/dear_colleague_sexualviolence.pdf.

[36] In its Dear Colleague Letter of April 4, 2011, the Department of Education noted that ***constructive knowledge*** "is the standard for administrative enforcement" of civil rights laws, such as Title IX, and in court cases where Petitioners are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is ***actual knowledge*** and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999)."

[37] Section f(1)(F)(IX)(ii)(Statistical reporting is required for "the crimes described in subclauses (I) through (VIII) of clause (i) of larceny-theft, simple assault, intimidation, and destruction, damage, or vandalism of property, and ***of other crimes involving bodily injury*** to any person…in which the victim is intentionally selected because of the actual or perceived race, gender, religion, national origin, sexual orientation, gender identity, ethnicity, or disability of the victim that are reported to campus security authorities or local police agencies, which data shall be collected and reported according to category of prejudice; and of ***domestic violence, dating violence, and stalking incidents that were reported to campus security authorities or local police agencies***.") (emphasis added).

other protected class categories such as race, color and national origin, this provision will

disproportionately inhibit the accurate reporting of statistics involving sexual assault, which

is the most common form of violence that occurs on the basis of a protected class category

and it rarely causes injury.

31. SaVE authorizes schools not to provide victims with individualized and personal notice of

their rights under civil rights laws unless there is an actual "report" of an incident. In

practice, this means that if an official is aware that a particular student was raped at a party,

but there has been no actual report of the incident, he or she would have no obligation to

inform the victim of her rights. While such rights are more passively available in student

handbooks, victims are more likely to report and/or assert their rights with individualized

notice at a time when such rights can be understood in a personal context. Without

individualized notice of rights, violence on the basis of sex is subjected to inherently unfair

standards because victims are less likely to achieve effective redress on campus, or

enforcement of rights via civil legal proceedings and federal and state oversight agencies.

32. Certain provisions of SaVE are facially unconstitutional to the extent they emanate from the

Commerce Clause because Congress has no general authority under the Commerce Clause to

regulate violence against women that occurs between private persons.[38]

33. To the extent Congress has authority to regulate violence against women under the Spending

Clause, it cannot do so in a manner that intrudes unconstitutionally into the authority of the

states.

34. To the extent Congress has authority to regulate violence against women, it cannot do so in

an unconstitutional manner by authorizing the redress of such violence under less protective

---

[38] *See* n.19.

standards compared to the redress of violence that occurs on the basis of other protected class

categories, such as race, color and national origin.

35. The DOE has defined violence on the basis of sex to include "rape," "sexual assault", "sexual

battery", and "sexual coercion."[39] SaVE defines "sexual assault" in two distinct ways. For the

purpose of annual statistical reporting of campus crimes, "sexual assault" is defined as "a

forcible or nonforcible sexual offense" under the Uniform Crime Reporting System of the

Federal Bureau of Investigation.[40] For the purpose of providing administrative redress

proceedings on campus, "sexual assault" is defined as "any nonconsensual sexual act

proscribed by Federal, tribal, or State law, including when the victim lacks capacity to

consent.[41] With regard to such redress proceedings, SaVE requires schools to incorporate and

apply state criminal law standards to a determination of whether violence on the basis of sex,

including sexual assault, occurred.[42] While not every violation of every state's incorporated

criminal code will constitute a civil rights violation, every incorporated state criminal code

necessarily includes conduct that can constitute a civil rights violation.

36. SaVE threatens Petitioner's rights because it allows her complaint to be redressed under

Virginia's less protective state criminal law standards,[43] rather than federal law's more

generous civil rights standards.

---

[39] *See* n.21.

[40] *Criminal Justice Information Services (CJIS) Division Uniform Crime Reporting (UCR) Program*, FEDERAL BUREAU OF INVESTIGATIONS (last visited Jan. 30, 2014), http://www.fbi.gov/about-us/cjis/ucr/recent-program-updates/reporting-rape-in-2013. http://www.fbi.gov/about-us/cjis/ucr/recent-program-updates/reporting-rape-in-2013.

[41] Violence Against Women, 113 Pub. L. No. 4, 127 Stat. 54; 29 U.S.C.S. § 3925 (23); 109 Pub. L. No. 162, 119 Stat. 2960.

[42] 20 U.S.C.§ 1092 (f)(8)(B)(I)(bb) (Each institution shall develop and distribute a policy which "shall include"…"the definition of domestic violence, dating violence, sexual assault, and stalking *in the applicable jurisdiction."*) (emphasis added).

[43] *See* Virginia Criminal Code § 18.2-61

37. SaVE violates core principles of federalism and threatens the Petitioner's and all women's equal protection and due process rights by subjecting the redress of their federal claims to disparate legal standards based on which state the offense occurred in. For example, Virginia criminal law requires proof of "force,"[44] while a victim attending college in another state suffering the exact same harm would have her claims effectively redressed irrespective of proof of force.[45]

38. SaVE further threatens the Petitioner's and all women's equal protection and due process rights by authorizing the redress of federal civil rights violations under state criminal law standards because, for example, the state criminal code definition of non-consent in Virginia, as in many states, is a more rigorous standard than the federal civil rights standard of unwelcomeness."[46] SaVE does not require violence that occurs on the basis of other

---

[44] *Id.*

[45] See compilation of statutes compiled by American Prosecutors Research Institute, available at http://www.arte-sana.com/articles/rape_statutes.pdf (noting wide disparity among the states as to whether proof of force is required.)

[46] *Id.*, (noting that some states, but not all, recognize a woman saying "no" as sufficient to establish non-consent. By contrast, under federal civil rights laws, conduct is uniformly assessed under a single standard to determine whether it was "unwelcome." "Unwelcome" is defined as conduct the student "did not request or invite it and considered the conduct to be undesirable or offensive. The age of the student, the nature of the conduct, and other relevant factors affect whether a student was capable of welcoming the sexual conduct. A student's submission to the conduct or failure to complain does not always mean that the conduct was welcome." http://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.html. In its April, 2011 Dear Colleague Letter, the Department of Education noted that a single rape will suffice to constitute severe harassment. The Department also cited the following federal cases in support of its view that a single sexually offensive event not rising to the level of rape can be sufficient to constitute a civil rights harm: *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*,595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*,474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a Petitioner's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005))).

protected class categories, such as race, color and national origin, to be assessed under state criminal law standards.

39. Assessing federal civil rights injuries under state criminal law standards subjects violence on the basis of sex to as many as fifty different state standards such that students in some states will be better protected from civil rights injuries than students in other states depending on how an offender's actions are defined by a particular state's criminal code. In practice, this means a victim who is raped on campus in a state where the criminal law definition of rape is very strict will have her redress proceedings subjected to more burdensome/less protective legal standards compared to redress proceedings on behalf of a victim in a different state who experiences exactly the same harm, only a few miles away, in a state where the criminal law definition of non-consent is less onerous. This disparate treatment of two victims who suffered exactly the same violence is unconstitutional and offends core principles of federalism by allowing state law definitions to dictate whether a federal civil rights offense occurred.[47]

40. Because SaVE covers only violence on the basis of sex, a student who endures non-violent verbal harassment will have her civil rights redressed under less burdensome/more protective standards, such as application of the "unwelcomeness" standard, compared to a student who endures a violent sexual assault, which will be redressed under more burdensome/less protective standards, such as application of the state criminal law definition of "non-consent." This means violent sex offenders are less likely to be held responsible for discrimination on the basis of sex compared to non-violent verbal harassers. Notably, while

---

[47] *See* John Decker & Peter Baroni, *"No" Still Means "Yes": The Failure of the Non-Consent Reform Movement in American Rape and Sexual Assault Law*, 101 NW. J. CRIM. L. & CRIMINOLOGY 1081 (2012) (noting the wide variety of definitions of non-consent among the states such that in some states lack of affirmative consent is enough, while in others, the lack of affirmative consent is not sufficient in the absence of force).

SaVE requires training on state criminal law standards, it requires no training whatsoever on the civil rights standard of "unwelcomeness."

41. Because SaVE covers only violence on the basis of sex, violence on the basis of other protected class categories, such as race, color and national origin, will be assessed under more protective civil rights standards.

42. SaVE nowhere requires that procedures for redressing violence on the basis of sex afford victims the same procedural and substantive protections as those that apply to violence on the basis of other protected class categories such as race, color and national origin.

43. Alongside less protective standards, SaVE is silent on the need for schools to comply with civil rights laws at all. Indeed, SaVE lacks the kind of language, typically included and necessary in new statutes that might encroach on important rights, that would protect against unintended diminution.[48] SaVE nowhere states, for example, that nothing in the statute "shall be construed to limit or inhibit existing legal protections under Title IX, Title IV and Title VI and related regulatory schemes, guidelines, case law and interpretive guidance from the Department of Education and Department of Justice." The absence of such language ensures SaVE's discriminatory application in the redress of violence on the basis of sex such that conflicts between Title IX and SaVE will be resolved in favor of SaVE even if such resolution interferes with the primary purpose of Title IX by preventing equitable redress.

---

[48] For example, in 1994, Congress amended the General Education Provisions Act (GEPA) to state that nothing in GEPA "shall be construed to affect the applicability of Title VI of the Civil Rights Act of 1964, Title IX of Education Amendments of 1972, Title V of the Rehabilitation Act of 1973, the Age Discrimination Act, or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department of Education has interpreted that provision to mean that the federal educational records privacy act (FERPA), which was enacted as part of GEPA, applies in the context of Title IX enforcement proceedings on campus, but if there is a conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. *See 2001 Guidance* at vii.

44. SaVE's requirements and enabling provisions, individually and collectively, violate various rights guaranteed to the Petitioner and similarly situated others, including rights under Title IX, Title IV and the First and Fourteenth Amendments to the United States Constitution. Relief is necessary to protect the rights of the Petitioner and all female students.

## IV. JURISDICTION AND VENUE

45. Petitioner's claims arise under Title IX of the Education Amendments of 1972, Title IV of the Civil Rights Act of 1964 the equal protection and due process clauses of the United States Constitution. Jurisdiction is conferred by 28 U.S.C. §§ 1983, 1331 and 1343(a)(3) and the Adminstrative Procedures Act, 5 U.S.C.S. § 706(1).

46. Petitioner's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

47. Venue is appropriate under 28 U.S.C. §§ 1391(b)(1), 1391(e).

## V. PARTIES

48. At all times relevant to this complaint, Jane Doe was an undergraduate student at UVA. She is currently a resident of the District of Columbia.

49. Respondent Kathleen Sebelius is the United States Secretary of Health and Human Services. Her regular place of business is 200 Independence Avenue S.W., Washington, D.C. 20201. She is sued in her official capacity and is responsible for the implementation and enforcement of Title IX and SaVE.

## VI. JURISDICTION

50. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 20 U.S.C. §1681 and 5 U.S.C. § 706 (1).

## VII. CLAIMS FOR RELIEF

### COUNT I
### MANDAMUS

51. Petitioner incorporates herein the allegations of paragraphs 1 through 50.

52. Title IX of the Education Amendments of 1972 provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

53. Respondents enforce numerous anti-discrimination laws that apply to "programs, services and activities receiving H.H.S. federal financial assistance," as well as "nondiscrimination provisions of other laws as they apply to programs and activities receiving H.H.S. federal financial assistance." http://www.hhs.gov/ocr/civilrights/resources/laws/index.html.

54. Section 1557 of the Patient Protection and Affordable Care Act (42 U.S.C. 18116) provides that an individual shall not be excluded from participation in, be denied the benefits of, or be subjected to discrimination on the grounds prohibited under, among other laws, Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 et seq. under any health program or activity, any part of which is receiving federal financial assistance, or under any program or activity that is administered by an Executive Agency or any entity established under Title I of the Affordable Care Act or its amendments.

55. Title IX rules provide that a recipient of federal funds "...shall not, on the basis of sex (1) treat one person differently from another in determining whether such person satisfies requirement or condition for the provision of such aid, benefit or service; (2) provide different aid, benefits, or services or provide aid, benefits, or services in a different manner; (3) deny any person any such aid, benefit, or service; (4) subject any person to separate or

different rules of behavior, sanctions, or other treatment;…(6) Aid or perpetuate

discrimination against any person by providing significant assistance to any agency,

organization or person which discriminates on the basis of sex in providing any aid, benefit,

or service to students or employees; (7) Otherwise limit any person in the enjoyment of any

right, privilege, advantage, or opportunity." Title 34 Part 106. Rule 106.31.

56. 34 C.F.R. § 106.39 applies to health benefits and services and states that "[i]n providing a

medical, hospital, accident, or life insurance benefit, service, policy, or plan to any of its

students, a recipient shall not discriminate on the basis of sex…"

57. According to its "Case Resolution Manual for Civil Rights Investigations," Respondents are

"required to undertake the prompt investigation of complaints of unlawful discrimination that

are accepted for investigation. Case investigations should be timely, legally sufficient and

dispositive of the allegations accepted for investigation. OCR must enforce the Federal civil

rights laws mindful of our goals of obtaining speedy relief for individual harms and

rectifying systemic harms where discrimination has occurred."

http://www.hhs.gov/ocr/civilrights/complaints/crm2009.pdf, at p. 20.

58. Respondents have jurisdiction over UVA and UVA Health System, where Petitioner received

forensic and health care services in the aftermath of the incident that formed the basis for the

complaint now pending before the Respondent agency. UVA and UVA Health System are

public entities and receive federal funds. As such, they must comply with the provisions of

Title IX of the Education Amendments of 1972 and other civil rights laws.

59. Respondents have failed to carry out their duty of promptness and by such failure has caused

and threatens to cause harm to Petitioner's rights and the rights of similarly situated others.

Delay until after March 7, 2014 will further subject Petitioner and others to harm because on

March 7 the redress of Petitioner's claims, and similar claims of others, will be subjected to

less legal protection and more legal burdens in violation of civil and constitutional rights.

60. Petitioner has no plain, speedy, and adequate remedy at law other than the remedies

requested by this action.

61. Respondents' failure to promptly investigate and resolve Petitioner's complaint has caused

and threatens to cause harm to Petitioner's rights and the rights of others, and is unlawful,

unreasonable, and exceptional. As a result, Petitioner and similarly situated others have

sustained, and will continue to sustain, injury and risk of injury to rights.

## COUNT II
## ADMINISTRATIVE PROCEDURES ACT

62. Petitioner incorporates herein the allegations of paragraphs 1 through 61.

63. Respondents' failure to promptly investigate and resolve Petitioner's complaint for more than

eighteen months constitutes "unreasonabl[e] delay" within the meaning of 5 U.S.C. § 706(2).

64. While this Court generally lacks jurisdiction to interfere with the exercise of discretion by an

agency, certain exceptional circumstances warrant judicial review. Such circumstances are

present here and the Respondent agency has unreasonably delayed its investigation and

resolution of Petitioner's complaint.

## COUNT III
## EQUAL PROTECTION

65.  Petitioner re-alleges paragraphs 1 through 64 and incorporates the same by reference in this

count.

66. Respondents have a duty to enforce laws consistent with the dictates of the Fourteenth

Amendments to the United States Constitution, which guarantees Petitioner and others equal

protection of the law. Public and private institutions are subject to constitutional restrictions

because the Equal Protection clause has been held coextensive with civil rights laws.

67. Petitioner's equal protection rights are threatened and violated by Respondents' actions because Respondents' failure to resolve her complaint promptly will result in Respondents resolving her complaint after March 7, 2014 when SaVE's new standards take effect. SaVE's standards allow and/or mandate the redress of Petitioner's claims and all other matters involving violence on the basis of sex under inequitable and less protective standards than standards in effect prior to March 7, 2014, and less protective than those that apply now and will continue to apply after March 7, 2104 to the redress of violence on the basis of other protected class categories such as race, color and national origin.

68. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain, injury and risk of injury to such rights.

## COUNT IV
## SUBSTANTIVE DUE PROCESS

69. Petitioner re-alleges paragraphs 1 through 68 and incorporates the same by reference in this count.

70. Respondents have a duty to enforce laws consistent with the dictates of the Fourteenth Amendment to the United States Constitution, which guarantees Petitioner substantive Due Process of law.

71. Respondents' failure to provide a prompt investigation and resolution exposes Petitioner's complaint, and the complaints of others, to redress under inadequate, inequitable and unconstitutional legal burdens.

72. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain, injury and risk of injury to such rights.

## COUNT V
## PROCEDURAL DUE PROCESS

73. Petitioner re-alleges paragraphs 1 through 72 and incorporates the same by reference in this count.

74. Respondents have a duty to enforce laws consistent with the dictates of the Fourteenth Amendment to the United States Constitution, which guarantees Petitioner procedural due process.

75. Petitioner's Procedural Due Process rights are threatened because she has been denied a meaningful hearing under applicable and constitutional legal standards by Respondents' delayed redress of her complaint.

76. After March 7, 2014, the due process rights of Petitioner and others will be subjected to less protective procedural standards in violation of procedural due process because SaVE substantially changes the law to allow for the application of less protective standards to Petitioner's complaint and the complaints of others.

77. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain, injury and risk of injury to such rights.

## COUNT VI
## FIRST AMENDMENT

78. Petitioner re-alleges paragraphs 1 through 77 and incorporates the same by reference in this count.

79. Respondents have a duty to enforce laws consistent with the dictates of the First Amendment to the United States Constitution, which guarantees Petitioner and similarly situated others rights of speech and petition.

80. Petitioner's First Amendment rights are chilled and denied by Respondents' delayed redress of her complaint and will be further chilled after March 7, 2014 because SaVE's less

protective and more burdensome standards will inhibit the reporting of matters involving violence against women.

81. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain, injury and risk of injury to such rights.

## COUNT VII
## TITLE IX

82. Petitioner re-alleges paragraphs 1 through 81 and incorporates the same by reference in this count.

83. Respondents have a duty to enforce laws consistent with the dictates of Title IX of the Education Amendments of 1972, which forbids discrimination on the basis of sex, guarantees Petitioner equal access to education and mandates that postsecondary schools adopt "prompt and equitable" policies and procedures to redress discrimination on the basis of sex, including violence on the basis of sex.

84. Respondents delayed redress of Petitioner's complaint threatens and violates Petitioner's rights and the rights of similarly situated others by subjecting the redress of her complaint and the complaints of others to less protective legal standards under SaVE.

85. SaVE will have a disparate impact on students on the basis of sex.

86. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain injury and risk of injury to such rights.

## COUNT VIII
## TITLE IV

87. Petitioner re-alleges paragraphs 1 through 86 and incorporates the same by reference in this count.

88. Respondents have a duty to enforce laws consistent with Title IV of the Civil Rights Act of 1964, which forbids discrimination in public institutions on the basis of sex.

89. Respondents delayed redress of Petitioner's complaint threatens and violates Petitioner's rights and the rights of others by subjecting violence on the basis of sex to less protective legal standards in violation of Title IV.

90. SaVE will have a disparate impact on students on the basis of sex.

91. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain injury and risk of injury to such rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully request that the Court:

1. Issue a writ of mandamus ordering Respondents to investigate and resolve her Complaint and issue a decision thereon before March 7, 2014;

2. Order that if Petitioner's complaint is not resolved until after March 7, 2014, Respondents shall not apply substantive provisions from SaVE to the resolution of Petitioner's complaint;

3. Declare identified aspects of SaVE unconstitutional and enjoin their future enforcement on behalf of Petitioner and similarly situated others.

Dated: February 20, 2014

MARSH LAW FIRM PLLC

By_____
James R. Marsh
Bar ID: 436448
P.O. Box 4668 #65135
New York, NY 10163-4668
Telephone / Fax: (212) 372-3030
Email: jamesmarsh@marshlaw.us

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>"Jane Doe" on behalf of herself and )<br>similarly situated others )<br>)<br>Petitioner, )<br>v. )<br>)<br>UNITED STATES DEPARTMENT of )<br>HEALTH and HUMAN SERVICES and )<br>KATHLEEN SEBELIUS in her official )<br>capacity as Secretary of the United States )<br>United States Department of Health and )<br>Human Services )<br>Respondents. )<br>_____ ) | Civil Action No. _____<br><br><br>**APPENDIX** |

## INDEX

**DOCUMENT 1:**    June 29, 2012, Complaint filed with the United States Department

of Health and Human Services

**DOCUMENT 2:**    July 19, 2012, Complaint acknowledgment from the United States

Department of Health and Human Services

**DOCUMENT 3:**    December 10, 2012, Request for additional information from the

United States Department of Health and Human Services

**DOCUMENT 4:**    Campus SaVe Act

# DOCUMENT 1



Form Approved: OMB No. 0990-0269.
See OMB Statement on Reverse

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**OFFICE FOR CIVIL RIGHTS (OCR)**
**CIVIL RIGHTS DISCRIMINATION COMPLAINT**

**OCR**

| YOUR FIRST NAME | YOUR LAST NAME |
|---|---|
| WENDY | MURPHY |

| HOME PHONE (Please include area code) | WORK PHONE (Please include area code) |
|---|---|
| 617-422-7410 | 617-422-7410 |

| STREET ADDRESS | CITY |
|---|---|
| New England Law|Boston  154 Stuart St. | BOSTON |

| STATE | ZIP | E-MAIL ADDRESS (If available) |
|---|---|---|
| MA | 02116 | WMURPHY@NESL.EDU |

Are you filing this complaint for someone else?   ☑ Yes   ☐ No
If Yes, whose civil rights do you believe were violated?

| FIRST NAME | LAST NAME |
|---|---|
| ███████ | ███████ |

I believe that I have been (or someone else has been) discriminated against on the basis of:

☐ Race / Color / National Origin   ☐ Age   ☐ Religion   ☑ Sex
☐ Disability   ☑ Other (specify):  EQUAL PROTECTION

Who or what agency or organization do you believe discriminated against you (or someone else)?
PERSON/AGENCY/ORGANIZATION
University of Virginia Health Systems and agents including but not limited to Nurse Kathryn Laughon and Dean Nicole Eramo

| STREET ADDRESS | CITY |
|---|---|
| 1215 Lee Street | Charlottesville |

| STATE | ZIP | PHONE (Please include area code) |
|---|---|---|
| VA | 22908 | 434-924-0211 |

When do you believe that the civil right discrimination occurred?
LIST DATE(S)   Ongoing, from December 8, 2011 through and including May, 2012.
(violation was discovered in April 2012)

Describe briefly what happened. How and why do you believe that you have been (or someone else has been) discriminated against? Please be as specific as possible. (Attach additional pages as needed)

(see attached)

I am filing as Counsel to complainant. She is submitting consent form by fax under separate cover.

Please sign and date this complaint. You do not need to sign if submitting this form by email because submission by email represents your signature.

| SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| Wendy J Murphy | 6/29/2012 |

Filing a complaint with OCR is voluntary. However, without the information requested above, OCR may be unable to proceed with your complaint. We collect this information under authority of Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973 and other civil rights statutes. We will use the information you provide to determine if we have jurisdiction and, if so, how we will process your complaint. Information submitted on this form is treated confidentially and is protected under the provisions of the Privacy Act of 1974. Names or other identifying information about individuals are disclosed when it is necessary for investigation of possible discrimination, for internal systems operations, or for routine uses, which include disclosure of information outside the Department of Health and Human Services (HHS) for purposes associated with civil rights compliance and as permitted by law. It is illegal for a recipient of Federal financial assistance from HHS to intimidate, threaten, coerce, or discriminate or retaliate against you for filing this complaint or for taking any other action to enforce your rights under Federal civil rights laws. You are not required to use this form. You also may write a letter or submit a complaint electronically with the same information. To submit an electronic complaint, go to OCR's web site at:
www.hhs.gov/ocr/civilrights/complaints/index.html. To mail a complaint see reverse page for OCR Regional addresses.

The remaining information on this form is optional. Failure to answer these voluntary questions will not affect OCR's decision to process your complaint.

**Do you need special accommodations for us to communicate with you about this complaint?** (Check all that apply)
☐ Braille   ☐ Large Print   ☐ Cassette tape   ☐ Computer diskette   ☐ Electronic mail   ☐ TDD

☐ Sign language interpreter (specify language): _____

☐ Foreign language interpreter (specify language): _____   ☐ Other: _____

**If we cannot reach you directly, is there someone we can contact to help us reach you?**

FIRST NAME ▓▓▓▓▓▓   LAST NAME ▓▓▓▓▓   *(father of complainant)*

HOME PHONE (Please include area code) ▓▓▓▓▓▓   WORK PHONE (Please include area code) ▓▓▓▓▓▓

STREET ADDRESS ▓▓▓▓▓▓▓▓   CITY ▓▓▓▓

STATE ▓▓▓   ZIP ▓▓▓▓   E-MAIL ADDRESS (if available) ▓▓▓▓▓▓▓▓▓▓▓▓▓

**Have you filed your complaint anywhere else?** If so, please provide the following. (Attach additional pages as needed)
PERSON/AGENCY/ORGANIZATION/ COURT NAME(S) *( See attached )*

DATE(S) FILED   CASE NUMBER(S) (if known)

**To help us better serve the public, please provide the following information for the person you believe was discriminated against (you or the person on whose behalf you are filing).**

ETHNICITY (select one)   RACE (select one or more)
☐ Hispanic or Latino   ☐ American Indian or Alaska Native   ☐ Asian   ☐ Native Hawaiian or Other Pacific Islander
☑ Not Hispanic or Latino   ☐ Black or African American   ☑ White   ☐ Other (specify): _____

PRIMARY LANGUAGE SPOKEN (if other than English) _____

**How did you learn about the Office for Civil Rights?**
☐ HHS Website/Internet Search   ☐ Family/Friend/Associate   ☐ Religious/Community Org   ☑ Lawyer/Legal Org   ☐ Phone Directory   ☐ Employer
☐ Fed/State/Local Gov   ☐ Healthcare Provider/Health Plan   ☐ Conference/OCR Brochure   ☐ Other (specify): _____

**To mail a complaint, please type or print, and return completed complaint to the OCR Regional Address based on the region where the alleged violation took place. If you need assistance completing this form, contact the appropriate region listed below.**

| Region I - CT, ME, MA, NH, RI, VT | Region V - IL, IN, MI, MN, OH, WI | Region IX - AZ, CA, HI, NV, AS, GU, |
|---|---|---|
| Office for Civil Rights, DHHS | Office for Civil Rights, DHHS | The U.S. Affiliated Pacific Island Jurisdictions |
| JFK Federal Building - Room 1875 | 233 N. Michigan Ave. - Suite 240 | Office for Civil Rights, DHHS |
| Boston, MA 02203 | Chicago, IL 60601 | 90 7th Street, Suite 4-100 |
| (617) 565-1340; (617) 565-1343 (TDD) | (312) 886-2359; (312) 353-5693 (TDD) | San Francisco, CA 94103 |
| (617) 565-3809 FAX | (312) 886-1807 FAX | (415) 437-8310; (415) 437-8311 (TDD) |
| | | (415) 437-8329 FAX |
| **Region II - NJ, NY, PR, VI** | **Region VI - AR, LA, NM, OK, TX** | |
| Office for Civil Rights, DHHS | Office for Civil Rights, DHHS | |
| 26 Federal Plaza - Suite 3312 | 1301 Young Street - Suite 1169 | |
| New York, NY 10278 | Dallas, TX 75202 | |
| (212) 264-3313; (212) 264-2355 (TDD) | (214) 767-4056; (214) 767-8940 (TDD) | |
| (212) 264-3039 FAX | (214) 767-0432 FAX | |
| **Region III - DE, DC, MD, PA, VA, WV** | **Region VII - IA, KS, MO, NE** | |
| Office for Civil Rights, DHHS | Office for Civil Rights, DHHS | |
| 150 S. Independence Mall West - Suite 372 | 601 East 12th Street - Room 248 | |
| Philadelphia, PA 19106-3499 | Kansas City, MO 64106 | |
| (215) 861-4441; (215) 861-4440 (TDD) | (816) 426-7277; (816) 426-7065 (TDD) | |
| (215) 861-4431 FAX | (816) 426-3686 FAX | |
| **Region IV - AL, FL, GA, KY, MS, NC, SC, TN** | **Region VIII - CO, MT, ND, SD, UT, WY** | **Region X - AK, ID, OR, WA** |
| Office for Civil Rights, DHHS | Office for Civil Rights, DHHS | Office for Civil Rights, DHHS |
| 61 Forsyth Street, SW. - Suite 16T70 | 999 18th Street, Suite 417 | 2201 Sixth Avenue - Mail Stop RX-11 |
| Atlanta, GA 30303-8909 | Denver, CO 80202 | Seattle, WA 98121 |
| (404) 562-7886; (404) 562-7884 (TDD) | (303) 844-2024; (303) 844-3439 (TDD) | (206) 615-2290; (206) 615-2296 (TDD) |
| (404) 562-7881 FAX | (303) 844-2025 FAX | (206) 615-2297 FAX |

**Burden Statement**
Public reporting burden for the collection of information on this complaint form is estimated to average 45 minutes per response, including the time for reviewing instructions, gathering the data needed and entering and reviewing the information on the completed complaint form. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: HHS/OS Reports Clearance Officer, Office of Information Resources Management, 200 Independence Ave. S.W., Room 531H, Washington, D.C. 20201. Please do not mail complaint form to this address.
HHS-699 (7/09) (BACK)

This Complaint is being filed against nurse Kathryn Laughon of the University of Virginia (UVA) Health Systems in Charlottesville, VA, and the UVA Health Systems and its agents, for: violating the privacy and confidentiality rights of a rape victim: submitting and/or causing to be submitted erroneous and/or misleading evidence in a matter where said rape was in controversy; failing to ascertain critically important forensic/medical evidence; and failing to produce photographs depicting the victim's internal vaginal injuries.

These actions, inter alia, violated the complainant's (hereafter "victim") rights because she suffered the denial and/or delay of health and/or forensic medical services based on sex, and/or other unlawful discrimination based on sex and/or violations of her right to equal protection of the law.

### RELEVANT BACKGROUND INFO

In the early hours of December 2, 2011 a male UVA student raped the victim, a female UVA student. On December 5, 2011 the victim reported the incident to the Associate Dean of Students. Nicole Eramo (also Chair of the Sexual Misconduct Board - SMB).

On December 5, 2011 the victim sought care and treatment at the emergency room of the Martha Jefferson Hospital. She was seen by a nurse and a doctor.

On December 6, 2011 the victim went to the UVA Student Health Center so that she could be tested for the AIDS virus.

On December 8, 2011 the victim reported the rape to the Charlottesville Police Department (CPD). After a lengthy interview the CPD took the victim to the UVA Health Systems facility to be examined by a SANE (Sexual Assault Nurse Examiner) and specifically called ahead to arrange for this exam to be done by nurse Kathryn Laughon. At the end of the examination Laughon told the victim's mother that there was a "jagged tear" of the hymen which is indicative of violence but that it could not be determined whether the injury was caused by penile penetration. The matter was subsequently submitted to the Commonwealth Attorney's Office for a determination regarding possible criminal prosecution. In her initial report from findings made on this date, Laughon wrote that she noted "TEARS" to the "Posterior Fourchette".

On January 20, 2012 the victim formally filed a complaint with UVA's SMB.

On February 3, 2012 the Commonwealth Attorney's Office informed the victim and her family that the matter would not be prosecuted because the evidence was insufficient. After reviewing the Police File months later the victim's parents discovered that Nurse Laughon had reported to the CPD that the victim suffered only "minor" injuries. It should be noted here that Nurse Laughon is married to the Deputy Commonwealth Attorney in Charlottesville, VA.

On February 27, 2012 the victim's parents, with a written release from the victim, visited the UVA Health System's medical records office to get a copy of Nurse Laughon's December 8, 2011 SANE report. After a two hour wait, they were handed an envelope containing one-page form, signed by the victim, authorizing consent for the forensic SANE examination and allowing limited release of relevant

information to law enforcement officials. The envelope also contained a six-page electronic form MR#2316115 forensic report and 6 photographs that were not numbered.

On February 29, 2012 the victim and her mother visited Nurse Laughon's office to request a letter from her explaining her findings in layman's terms that could be submitted to the SMB for consideration in connection with the upcoming hearing before UVA's SMB. The victim and her family requested Nurse Laughon prepare a letter of her findings in language that the SMB (a lay Board with no specialized medical knowledge) could easily understand, and that Laughon submit no graphic photos. During this meeting, Nurse Laughon informed the victim and her mother that there was no indication in any of the findings to indicate that a sexual assault had occurred. When asked about the "jagged tear" she told them she had observed during the examination on December 8, Nurse Laughon stated it was a "cleft" at 11 o'clock, and that this was a natural finding in women's bodies. At this same meeting, despite overwhelming evidence that the victim had been drugged prior to the rape, (evidence that was not ascertained or recorded in any medical record by Nurse Laughon during the December 8 SANE examination) Nurse Laughon then gratuitously offered advice about how to handle evidence of the victim's incapacitation when the issue came up at the hearing  Nurse Laughon told the victim and her mother to "focus on the alcohol and don't talk about being drugged".  She specifically recommended that they contact a particular toxicologist who could give expert testimony on the amount of alcohol consumed by the victim and its possible effects on her capacity to consent

On March 17, 2012 Nurse Laughon hand delivered a letter to the victim at her dorm so that she could submit it to the SMB for consideration at the hearing on March 30, 2012.

On March 30, 2012, Nurse Laughon's letter was submitted to the Panel at the SMB hearing.  The letter erroneously failed to note the victim's vaginal injuries.  Later that evening the SMB ruled in favor of the perpetrator

On April 9, 2012 the victim received a copy of the SMB's written Decision in which the Chair of the SMB, Nicole Eramo, described having had a lengthy one-on-one conversation with Nurse Laughon prior to the hearing, during which time Laughon informed Eramo that the victim had "no injuries". Eramo also described how she (Eramo) shared the victim's other medical records from another hospital with Nurse Laughon, without the victim's consent and in direct violation of the victim's specific instructions that said records were to be viewed by only SMB panel members, the accused and two student Advisors who participated in the SMB proceeding on behalf of the victim and the accused offender. Not only did Eramo share confidential medical information with Nurse Laughon, but also, Nurse Laughon then formed an opinion about the information she knew she had no consent to review and provided statements and evidence to the SMB that erroneously misstated the findings so as to diminish the importance of the report as a document that substantially corroborated the victim's report of rape  The Chair of the SMB heavily relied on Laughon's report and deceptive opinions in the written Decision  This point deserves repeating.  Nurse Laughon had neither written nor verbal permission to review the material and/or to discuss the information with Nicole Eramo but she both accessed the information and used it to formulate a false and misleading

statement about its significance, then distributed her false and misleading statement to the chair of the SMB in an effort to unjustly influence the SMB's decision. Disturbingly, Laughon never once informed the victim or her family that she accessed the information, had a conversation with Eramo, or that she submitted an erroneous forensic opinion about the information to the SMB, even though she spoke with the victim and her family at length prior to the Hearing.

Even more disturbing, and similarly unknown to the victim at the time, is Nurse Laughon's failure to disclose to the victim at *any* time that she had a serious conflict of interest as a forensic medical professional as she also serves as Chair of UVA's SMB Advisory Committee.

Nurse Laughon not only violated the victim's important, fundamental and constitutionally protected rights, she also caused harm to the integrity of the evidence considered by the SMB and led directly to the SMB unjustly ruling in favor of the accused student, causing further emotional damage and distress to a vulnerable victim who had already been diagnosed with PTSD at the time Laughon engaged in deceptive, unethical and illegal actions.

After discovering that Laughon had violated the victim's rights, the victim's parents sought guidance from an independent expert to evaluate the integrity of Nurse Laughon's December 8, 2011 SANE report. This expert opined that Laughon's examination, report and response to the victim's request for photographs from the SANE exam were profoundly sub-standard and violated established SANE protocol. This expert further determined that Nurse Laughon failed to properly document the victim's symptoms of having been drugged and inexplicably omitted the victim's vaginal injuries in her follow-up report to the SMB. This independent expert also noted that in Laughon's report to the SMB, Lauhon described the procedures she undertook to examine the victim, including that she inserted a catheter into the victim's body and took extensive photographs after applying dye to ensure that internal injuries would be clearly depicted. Notwithstanding Laughon's description of having done these things, not a single photograph has been produced showing *any* internal images of the vagina, catheterization, or the use of dye during the exam.

On April 16, 2012, the victim's parents confronted Nurse Laughon by email about these various discrepancies as well as concerns about the absence of the "jagged tear" finding in her report to the SMB and the fact that Laughon violated the victim's privacy without consent when she discussed information with Dean Eramo. Nurse Laughon responded to the victim's parents by email and stated that the victim "waived" her right to privacy by asking her to write a report to the SMB. The victim was never informed of any such waiver and signed nothing indicating that such a waiver had been effectuated, nor did Laughon request a written release from the victim at anytime for any purpose. Conversely and despite this purported "waiver" Nurse Laughon responded to the victim's mother's request for information about the exam by saying the information was privileged and confidential and that nothing could be discussed unless the victim was physically present to give her consent. Laughon also informed the victim's parents in another email that she had uploaded "all" the photos, but to this day she has never once explained the missing photographs or informed the victim's parents about why *none* of the photographs

in the victim's file depict the interior of the vaginal area, catheterization or the use of dye. Significantly, Nurse Laughon's report nowhere contains a "photo log" as required by SANE protocol.

After receiving Laughon's troubling and inadequate email response, the victim's father, with written consent of the victim, endeavored to obtain copies of the entire file and all the photographs directly from the UVA medical records office. He was denied any and all access without explanation.

After several failed attempts, he wrote to the COO of UVA Health Systems and filed a complaint with the JCAHO in an effort to force disclosure.

On April 28, 2012 the victim's father received a responsive email followed by a Federal Express package. Information released on this date included only the same six photographs that had originally been produced (with no internal images of the vagina, no images of catheterization and no dye) and the email response stated that the examination had been done properly and all records had been released. Also released were several documents pertaining to the December 8, 2011 report that had not previously been provided to the victim the first time she requested copies of her entire file. This time, the format of the report was different and the information had been changed to exclude mention of damage to the "Posterior Fourchette"; the location in the vagina where serious "jagged tear" injuries were initially reported.

This newly released information claimed that the victim was brought to the UVA medical facility by the CPD for "Photos only". This claim about "Photos only" was made for the first time only *after* the UVA's SMB Appeal Board and the Hospital itself were provided with a copy of the independent expert's report describing how Nurse Laughon did not follow protocol or standards for conducting a proper SANE exam. This newly released information nowhere explained why, if the victim had been brought to the UVA facility for "Photos only", Nurse Laughon would have conducted a full SANE examination, as she had victim sign two releases for "photography" and for a "forensic exam", just another inconsistency. Nor does it make sense that if a rape victim is brought to a medical facility for "Photos only", a nurse would take only six meaningless photographs of the external body rather than internal photographs of the vagina using standard protocol and procedures such as the use of dye and catheterization. That the required photo log is missing is further evidence that this claim is false. In the event a victim of any crime is taken to a forensic facility for photographs, the log ensures that proper evidentiary rules are followed so that important evidence can be admitted at trial if a criminal case is filed.

The victim herself confirmed that Laughon did a lengthy examination and did not limit the purpose of the visit to "Photos only". Moreover, the victim herself confirmed that Laughon took *dozens* of photographs, including internal images of the vaginal injuries, and that Laughon used a catheter and dye to facilitate the process.

The victim's father addressed his concerns in this matter with Michael Strine, COO of UVA Health Systems, who inexplicably saw no irregularities in the fact that only six photographs exist in a reported rape case and that none of them depict the

interior of the vagina, reported internal injuries, the use of dye or catheterization.

On May 15, 2012 the victim was re-examined by a highly qualified, experienced and independent SANE nurse who runs the SANE program at the INOVA Hospital in Fairfax, Virginia. She examined the victim and found serious internal vaginal injuries, in a stage of healing consistent with the time that had passed since the rape. This nurse expressed serious concerns that these serious findings were not mentioned in Nurse Laughon's report and that this was highly irregular and significantly substandard. In particular, this nurse noted that injuries suffered by the victim were consistent with traumatic sexual assault as there were multiple injuries including a major hymenal tear at 7 o'clock. This nurse reviewed Nurse Laughon's work overall and concluded that Laughon's finding were inaccurate and unsubstantiated and that Nurse Laughon's care and treatment as a forensic and medical professional fell substantially below any standard of care.

More particularly, this nurse noted that Laughon failed to document symtoms indicating that the victim had been incapacitated by drugs at the time of the rape. This failure was critically harmful because "rape drugs" dissipate quickly and reported symptoms are often the only evidence available to establish incapacity and properly determine the victim's condition and need for medical intervention. She also noted that Nurse Laughon failed to submit her work to a peer review process. Peer review is mandatory when possible conflicts of interest are present as was the case here given that Nurse Laughon is a SANE nurse in the UVA Health System as well as a Professor of nursing at UVA and Chair of the Sexual Misconduct Advisory Committee. Clearly, a nurse with such significant ties to UVA lacks sufficient independence vis a vis a victim who was raped by another UVA student given UVA's interest in avoiding public scandal and protecting its students from the public shame of criminal prosecution.

Curiously, given the breadth of Nurse Laughon's substandard work in this matter, UVA Health Systems has not submitted a bill for services to the Virginia Criminal Injuries Compensation Fund (CICF), which refunds all expenses incurred in forensic examinations and aftercare for victims of sexual assault. That no request was submitted for compensation suggests that UVA may be intentionally insulating itself from oversight by refusing compensation as a way of avoiding compliance with national standards for the care of rape victims. According to the CIFC, as of June 2012, UVA Health Systems has not filed a single claim for reimbursement since July 2011, which is highly unusual as this is the only SANE program in Albemarle County where UVA is situated.

## SUMMARY AND CONCLUSION

Nurse Laughon repeatedly violated the standard of care and caused substantial harm to the victim's substantive rights.

1. Laughon changed her findings from her first report in December 8, 2011 where she reported finding "TEARS" to the "Posterior Fourchette" of the external genitalia, which is typically indicative of sexual assault, and altered her findings to state "no injuries" when she prepared a second report dated March 17, 2012.

2. Laughon failed without explanation to produce critically important photographs of the victim's internal vaginal injuries.


3. Laughon failed to reveal to the victim her conflict of interest and substantial ties to UVA and failed to submit her work to a peer review process as is mandatory in the face of conflict.

4. Laughon accessed protected medical information to which she was not entitled, and shared protected medical information without consent of the victim and against the explicit statement of the victim that there be no sharing of information with individuals other than those to whom the victim had given written authorization.

5. Laughon intentionally introduced into the SMB's decision-making process erroneous, misleading and/or false information.

6. Laughon intentionally failed to ascertain critically important information about the victim's symptoms related to drug-induced incapacitation.

Finally, it should also be noted that related complaints have been filed with the Department of Education's Office for Civil Rights, and the Office for Civil Rights HIPAA enforcement office, alleging a multitude of violations of the victim's privacy, confidentiality and civil rights. The allegations set forth herein are included in that complaint. This Complaint is submitted separately and in addition to that complaint because it relates specifically to the actions of a medical professional with respect to substandard care as well as illegal and unethical conduct.

# DOCUMENT 2



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Voice - (215) 861-4441, (215) 861-4440
(FAX) - (215) 861-4431   http://www.hhs.gov/ocr/

**OFFICE OF THE SECRETARY**

**Office for Civil Rights, Region III**
**150 S. Independence Mall West**
**Public Ledger Building, Suite 372**
**Philadelphia, PA 19106-3499**

July 19, 2012

Ms. Murphy Wendy
154 Stuart St
Boston, MA 02116

Our Transaction number: 03-12-145773

Dear Ms. Wendy:

Thank you for your correspondence received by the Department of Health and Human Services, Office for Civil Rights (OCR).

We are in the process of reviewing your complaint to decide whether OCR has authority and is able to take action with respect to the matters you have raised. Please note that due to the high volume of complaints we are currently processing, we are backlogged and may require additional time to complete our initial review of your complaint.

Once we have completed our initial review of your complaint, an investigator will contact you by telephone or by letter. If you have any questions about the investigatory process, you may pose them at that time to the investigator assigned to your case. For ease of identification please include the Transaction Number shown above on any correspondence to OCR.

Thank you for your patience in this matter. Please be assured that we are committed to resolving your complaint as expeditiously as possible.

Sincerely,

*Marlene L. Rey*

Marlene L. Rey
Acting Regional Manager

# DOCUMENT 3



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of the Secretary

Voice - (816) 426-7277, (800) 368-1019                    Office for Civil Rights, Region VII
TDD - (816) 426-7065, (800) 537-7697                       601 East 12th Street, Room 353
Fax - (816) 426-3686                                        Kansas City, MO 64106
http://www.hhs.gov/ocr

December 10, 2012

Ms. Wendy Murphy
154 Stuart St.
Boston, MA 02116

Our Transaction number:  12-145773

Dear Ms. Murphy:

Thank you for your complaint received on July 16, 2012, by the Department of Health and
Human Services (HHS), Office for Civil Rights (OCR), alleging a violation of the Federal
Standards for Privacy of Individually Identifiable Health Information and/or the Security
Standards for the Protection of Electronic Protected Health Information (45 C.F.R. Parts 160 and
164, Subparts A, C, and E, the Privacy and Security Rules) by University of Virginia Health
System (Covered Entity). Your complaint is on behalf of ████████████ (Third Party), and
this file has been referred to this office, the OCR Kansas City Regional Office for processing.

Specifically, you allege that Nurse Laughon repeatedly violated the standard of care and caused
substantial harm to the Third Party's substantive rights.

OCR is responsible for enforcing a Federal law that protects the privacy of health information
and a variety of Federal civil rights laws that prohibit discrimination. Specifically, OCR has
jurisdiction over programs and entities that receive Federal financial assistance from HHS in
cases involving discrimination based on race, color, national origin, age, disability, and, under
certain circumstances, sex and religion. Additionally, OCR has jurisdiction over health and
human service programs operated by HHS or by state and local public entities in cases involving
disability-based discrimination. OCR also has jurisdiction over health plans, health care
clearinghouses, and certain health care providers with respect to enforcement of Federal
Standards for Privacy of Individually Identifiable Health Information and/or the Security
Standards for the Protection of Electronic Protected Health Information (45 C.F.R. Parts 160 and
164, Subparts A, C, and E, the Privacy and Security Rules).

In order to investigate your complaint we need additional information. Please provide to OCR
the following:

1) Please re-state your allegation(s) and please be specific.

2) In your complaint to this office you state that you also filed a complaint with the
   Department of Education's Office for Civil Rights; what is the status of that complaint?

Page 2 of 2 – Murphy – 12-145773

3) Please identify who you make your allegation(s) against. If you make your allegation against an individual(s), please specify who the individual(s) is employed with (e.g. hospital, clinic, etc.).

4) Names and contact information of any witnesses (address, phone number, e-mail address, etc.).

5) Any evidence that substantiates your allegations.

For organization purposes I would request that in submitting the above information you label it to correspond with the above numbers. Please return the requested information to this office within **20 days** of the date of this letter. We need this information to continue processing your complaint. If we do not receive this information within 20 days of the date of this letter we will close your file.

If you have questions, please write us or contact Ashtan N. Mitchell, Equal Opportunity Specialist, at (816) 426-6369 (Voice), (816) 426-7065 (TDD).When contacting this office, please remember to include the identification number that we have given your file. That number is located in the upper left-hand corner of this letter.

Sincerely,

Ashtan N. Mitchell,
Equal Opportunity Specialist

# DOCUMENT 4

"(D) The grantee shall train all members of campus disciplinary boards to respond effectively to situations involving domestic violence, dating violence, sexual assault, or stalking."; and

(5) in subsection (e), by striking "there are" and all that follows through the period and inserting "there is authorized to be appropriated $12,000,000 for each of fiscal years 2014 through 2018.".

**SEC. 304. CAMPUS SEXUAL VIOLENCE, DOMESTIC VIOLENCE, DATING VIOLENCE, AND STALKING EDUCATION AND PREVENTION.**

(a) In General.—Section 485(f) of the Higher Education Act of 1965 (20 U.S.C. 1092(f)) is amended—

(1) in paragraph (1)—

(A) in subparagraph (C)(iii), by striking the period at the end and inserting ", when the victim of such crime elects or is unable to make such a report."; and

(B) in subparagraph (F)—

(i) in clause (i)(VIII), by striking "and" after the semicolon;

(ii) in clause (ii)—

(I) by striking "sexual orientation" and inserting " national origin, sexual orientation, gender identity,"; and

(II) by striking the period and inserting "; and"; and

(iii) by adding at the end the following:

"(iii) of domestic violence, dating violence, and stalking incidents that were reported to campus security authorities or local police agencies.";

(2) in paragraph (3), by inserting ", that withholds the names of victims as confidential," after "that is timely";

(3) in paragraph (6)(A)—

(A) by redesignating clauses (i), (ii), and (iii) as clauses (ii), (iii), and (iv), respectively;

(B) by inserting before clause (ii), as redesignated by subparagraph (A), the following:

"(i) The terms 'dating violence', 'domestic violence', and 'stalking' have the meaning given such terms in section 40002(a) of the Violence Against Women Act of 1994 (42 U.S.C. 13925(a))."; and

(C) by inserting after clause (iv), as redesignated by subparagraph (A), the following:

"(v) The term 'sexual assault' means an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation.";

(4) in paragraph (7)—

(A) by striking "paragraph (1)(F)" and inserting "clauses (i) and (ii) of paragraph (1)(F)"; and

(B) by inserting after "Hate Crime Statistics Act." the following: "For the offenses of domestic violence, dating violence, and stalking, such statistics shall be compiled in accordance with the definitions used in section 40002(a) of the Violence Against Women Act of 1994 (42 U.S.C. 13925(a)).";

(5) by striking paragraph (8) and inserting the following:

"(8)(A) Each institution of higher education participating in any program under this title and title IV of the Economic Opportunity Act of 1964, other than a foreign institution of higher education, shall develop and distribute as part of the report described in paragraph (1) a statement of policy regarding—

"(i) such institution's programs to prevent domestic violence, dating violence, sexual assault, and stalking; and

"(ii) the procedures that such institution will follow once an incident of domestic violence, dating violence, sexual assault, or stalking has been reported, including a statement of the standard of evidence that will be used during any institutional conduct proceeding arising from such a report.

"(B) The policy described in subparagraph (A) shall address the following areas:

"(i) Education programs to promote the awareness of rape, acquaintance rape, domestic violence, dating violence, sexual assault, and stalking, which shall include—

"(I) primary prevention and awareness programs for all incoming students and new employees, which shall include—

"(aa) a statement that the institution of higher education prohibits the offenses of domestic violence, dating violence, sexual assault, and stalking;

"(bb) the definition of domestic violence, dating violence, sexual assault, and stalking in the applicable jurisdiction;

"(cc) the definition of consent, in reference to sexual activity, in the applicable jurisdiction;

"(dd) safe and positive options for bystander intervention that may be carried out by an individual to prevent harm or intervene when there is a risk of domestic violence, dating violence, sexual assault, or stalking against a person other than such individual;

"(ee) information on risk reduction to recognize warning signs of abusive behavior and how to avoid potential attacks; and

"(ff) the information described in clauses (ii) through (vii); and

"(II) ongoing prevention and awareness campaigns for students and faculty, including information described in items (aa) through (ff) of subclause (I).

"(ii) Possible sanctions or protective measures that such institution may impose following a final determination of an institutional disciplinary procedure regarding rape, acquaintance rape, domestic violence, dating violence, sexual assault, or stalking.

"(iii) Procedures victims should follow if a sex offense, domestic violence, dating violence, sexual assault, or stalking has occurred, including information in writing about—

"(I) the importance of preserving evidence as may be necessary to the proof of criminal domestic violence, dating violence, sexual assault, or stalking, or in obtaining a protection order;

"(II) to whom the alleged offense should be reported;

"(III) options regarding law enforcement and campus authorities, including notification of the victim's option to—

"(aa) notify proper law enforcement authorities, including on-campus and local police;

"(bb) be assisted by campus authorities in notifying law enforcement authorities if the victim so chooses; and

"(cc) decline to notify such authorities; and

"(IV) where applicable, the rights of victims and the institution's responsibilities regarding orders of protection, no contact orders, restraining orders, or similar lawful orders issued by a criminal, civil, or tribal court.

"(iv) Procedures for institutional disciplinary action in cases of alleged domestic violence, dating violence, sexual assault, or stalking, which shall include a clear statement that—

"(I) such proceedings shall—

"(aa) provide a prompt, fair, and impartial investigation and resolution; and

"(bb) be conducted by officials who receive annual training on the issues related to domestic violence, dating violence, sexual assault, and stalking and how to conduct an investigation and hearing process that protects the safety of victims and promotes accountability;

"(II) the accuser and the accused are entitled to the same opportunities to have others present during an institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice; and

"(III) both the accuser and the accused shall be simultaneously informed, in writing, of—

"(aa) the outcome of any institutional disciplinary proceeding that arises from an allegation of domestic violence, dating violence, sexual assault, or stalking;

"(bb) the institution's procedures for the accused and the victim to appeal the results of the institutional disciplinary proceeding;

"(cc) of any change to the results that occurs prior to the time that such results become final; and

"(dd) when such results become final.

"(v) Information about how the institution will protect the confidentiality of victims, including how publicly-available recordkeeping will be accomplished without the inclusion of identifying information about the victim, to the extent permissible by law.

"(vi) Written notification of students and employees about existing counseling, health, mental health, victim advocacy, legal assistance, and other services available for victims both on-campus and in the community.

"(vii) Written notification of victims about options for, and available assistance in, changing academic, living, transportation, and working situations, if so requested by the victim and if such accommodations are reasonably available, regardless of whether the victim chooses to report the crime to campus police or local law enforcement.

"(C) A student or employee who reports to an institution of higher education that the student or employee has been a victim of domestic violence, dating violence, sexual assault, or stalking, whether the offense occurred on or off campus, shall be provided

with a written explanation of the student or employee's rights and options, as described in clauses (ii) through (vii) of subparagraph (B).";

(6) in paragraph (9), by striking "The Secretary" and inserting "The Secretary, in consultation with the Attorney General of the United States,";

(7) by striking paragraph (16) and inserting the following:

"(16)(A) The Secretary shall seek the advice and counsel of the Attorney General of the United States concerning the development, and dissemination to institutions of higher education, of best practices information about campus safety and emergencies.

"(B) The Secretary shall seek the advice and counsel of the Attorney General of the United States and the Secretary of Health and Human Services concerning the development, and dissemination to institutions of higher education, of best practices information about preventing and responding to incidents of domestic violence, dating violence, sexual assault, and stalking, including elements of institutional policies that have proven successful based on evidence-based outcome measurements."; and

(8) by striking paragraph (17) and inserting the following:

"(17) No officer, employee, or agent of an institution participating in any program under this title shall retaliate, intimidate, threaten, coerce, or otherwise discriminate against any individual for exercising their rights or responsibilities under any provision of this subsection.".

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect with respect to the annual security report under section 485(f)(1) of the Higher Education Act of 1965 (20 U.S.C. 1092(f)(1)) prepared by an institution of higher education 1 calendar year after the date of enactment of this Act, and each subsequent calendar year.

# TITLE IV—VIOLENCE REDUCTION PRACTICES

### SEC. 401. STUDY CONDUCTED BY THE CENTERS FOR DISEASE CONTROL AND PREVENTION.

Section 402(c) of the Violence Against Women and Department of Justice Reauthorization Act of 2005 (42 U.S.C. 280b–4(c)) is amended by striking "$2,000,000 for each of the fiscal years 2007 through 2011" and inserting "$1,000,000 for each of the fiscal years 2014 through 2018".

### SEC. 402. SAVING MONEY AND REDUCING TRAGEDIES THROUGH PREVENTION GRANTS.

(a) SMART PREVENTION.—Section 41303 of the Violence Against Women Act of 1994 (42 U.S.C. 14043d–2) is amended to read as follows:

### "SEC. 41303. SAVING MONEY AND REDUCING TRAGEDIES THROUGH PREVENTION (SMART PREVENTION).

"(a) GRANTS AUTHORIZED.—The Attorney General, in consultation with the Secretary of Health and Human Services and the Secretary of Education, is authorized to award grants for the purpose of preventing domestic violence, dating violence, sexual assault, and stalking by taking a comprehensive approach that focuses